# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs April 18, 2012

## STATE OF TENNESSEE v. GARY ADAMS[1]

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2008-C-3075     Cheryl A. Blackburn, Judge**

---

**No. M2011-00629-CCA-R3-CD - Filed January 31, 2013**

---

A Davidson County Criminal Court Jury convicted the appellant, Gary Adams, of four counts of aggravated rape. The trial court imposed four, consecutive sentences of twenty-five years for a total effective sentence of 100 years in the Tennessee Department of Correction. On appeal, the appellant challenges the sufficiency of the evidence sustaining his convictions, the trial court's refusal to merge the convictions, and the sentences imposed by the trial court. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ALAN E. GLENN and ROGER A. PAGE, JJ., joined.

Ron E. Munkeboe, Jr., (at trial and on appeal) and Dana Nero (at trial), Nashville, Tennessee, for the appellant, Gary Adams.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Jeff Burks and Brian Ewald, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

---

[1]The indictment states that the appellant is also known as"Kevin Cooper" and "Garry Adams."

At trial, the victim, N.D.,[2] testified that in July 2000, she was eighteen years old and lived in apartment 3623 of the Hickory Ridge Apartments complex with her then-boyfriend, David Laymance; Chad Chester; and Chester's son, Dusty. Around 6:00 a.m. on Sunday, July 23, 2000, the victim drove Laymance to work then returned to the apartment complex. After she parked, she went upstairs to her apartment. Upon remembering that she had left a $10 bill on the dashboard, the victim went downstairs to retrieve the cash. She was wearing a white tank top and blue jeans. While she was at her car, she was approached by a clean-shaven black man who was "a little taller" than the victim. The man had very dark skin; short, curly hair; and a wide nose. The victim later identified the man as the appellant. She said that the appellant asked for directions to apartment 3621. When the victim looked away to discern whether the apartment was upstairs or downstairs, the appellant turned her around and began strangling her with a piece of black fabric, which looked like a flat shoelace or rope. He pulled the fabric so tight that the victim lost consciousness for a few seconds, and she fell into her car through the open door.

The victim said that the appellant lifted her by her neck and told her to get up. Afraid the appellant would kill her, she tried to scream, but he pulled the fabric tighter, and she was unable to make any noise. The appellant warned her to be quiet and dragged her by the fabric around her neck. The victim stated that she lost her shoes while she was being pulled and, at the time of trial, had scars on her toes from being pulled on the sidewalk. The appellant led the victim to an area between two apartment buildings where there was a drainpipe and a wall approximately three or four feet high made of railroad ties. The appellant made her lean over the short wall and undo her pants. The appellant slightly penetrated her vagina with his penis. When he was unable to achieve full penetration, he then digitally penetrated her vagina. Thereafter, he penetrated her anus slightly with his penis.

A few minutes later, the appellant ordered the victim to pull up her pants and dragged her by the fabric around her neck toward the stairwell behind the apartment building. The appellant made the victim take her pants down and forced her to get "on all fours." He digitally penetrated her vagina and penetrated her vagina and her anus with his penis. The victim said that the appellant ejaculated in her vagina and her anus. Afterward, the appellant ordered the victim to remain on her hands and knees and to count to 100 before getting up. The victim complied, listened to make sure he left, pulled up her pants, and ran to her apartment. Chad Chester was awake when she got to the apartment. The victim told him what had happened, and he called the police. Police arrived approximately thirty minutes later, and the victim told the first officer to arrive about the incident. She later spoke with Detective Kyle Anderson and, within an hour after the rapes, wrote a statement. When she

---

[2]It is the policy of this court to refer to victim's of sexual offenses by their initials.

finished the statement, Detective Anderson drove her to Metro General Hospital where she was treated, and vaginal and anal swabs were taken. Thereafter, the victim was allowed to return home.

The victim stated that throughout the incident, the appellant kept the fabric around her neck and did not remove it until he left. She said that the appellant held the fabric so tightly that it "tore off the first layer of skin" on her neck. She said that she had "a pretty nasty wound" for several weeks after the incident and that she had a "red mark" around her neck for about two years. She was certain the appellant was the perpetrator, explaining that she stood "face to face" looking at the appellant and that the events of that day were "burned into [her] memory." She said that she could recall the clothes the appellant was wearing and the look on his face.

On cross-examination, the victim acknowledged that she had previously seen the appellant in court and that his appearance had changed during the ten years since the incident. She also acknowledged that she did not mention in her written statement that the appellant had digitally penetrated her; however, she stated, "I"ve never made that a secret in the past when I've talked about it." She explained that talking about the intimate details of the incident was difficult for her.

She asserted that the appellant accomplished partial penile penetration at the first location. She stated that she did not have any injuries to her "private area" after the rapes.

She acknowledged that the call to police reporting the rapes was placed at 5:53 a.m. and that, therefore, the rapes occurred prior to that time. She said that she felt like the incident lasted "forever" but that she arrived at the apartment about 5:40 a.m. and that the entire incident probably lasted about thirteen minutes, with a few minutes spent at each location.

She maintained that she had not had sex with anyone other than Laymance in the days prior to the rapes. She acknowledged that she had heard of a club named Gecko's and stated that she might have gone there once.

Metropolitan Police Sergeant Chris Warner testified that on July 23, 2000, he was dispatched to the scene of a reported rape at Hickory Ridge Apartments. When he arrived at the scene, Sergeant Warner spoke with the victim, secured the scene, and called the homicide and identification divisions of the police department. Sergeant Warner said he had no further involvement in the case.

Raymond T. Rayder, Jr., testified that on July 23, 2000, he was an officer with the

identification department of the Metropolitan Police Department and that Detective Anderson requested that he process the scene of the rapes at Hickory Ridge Apartments.[3] He tried to retrieve latent fingerprints from the victim's car and collected the clothes the victim was wearing at the time of the rapes. In the dirt behind the stairwell, he saw a liquid substance he believed to be semen, and he collected it in a vial.

On cross-examination, Rayder said that a presumptive test on the dirt revealed that it contained semen. Rayder said that behind the stairwell, the dirt was a "soft[,] powdery type substance" in which he saw the imprint of "a pair of small type frame hands . . . [and] what appeared to be knees."

Kyle Anderson testified that on July 23, 2000, he was a Metropolitan Police Department homicide detective.[4] He responded to the scene and drove the victim to the hospital.

Sandy Meyers, a nurse practitioner at Metro General Hospital, said that on July 23, 2000, she performed a rape kit on the victim. The victim reported that she had been raped vaginally and anally; therefore, Meyers collected vaginal, labial, and anal swabs from the victim, as well as samples of her blood and "brushings" from her pubic hair. Meyers stated that the victim had a one-centimeter linear abrasion around her neck and an approximately eight-centimeter bruise on her leg. She also noted that an area about one centimeter from the tip of the victim's tongue was redder than normal. The victim also had a one-centimeter abrasion on the toes of her left foot. Meyers said that she did not observe any injuries to the victim's vaginal area, but she explained that it was not unusual for a rape victim to have no visible injuries.

Detective Keith Sutherland testified that in July 2000, he was assigned to the Metropolitan Police Department's Sex Crimes Unit. He said that he submitted the rape kit to the Tennessee Bureau of Investigation (TBI) crime laboratory for testing in August 2000. In December 2002, he resubmitted the rape kit and the victim's clothes for more specific testing. At that time, a DNA profile was found, but police did not have a suspect.

He said that on July 21, 2008, he "learned of" the appellant. Detective Sutherland found the appellant in Indianapolis, Indiana, and he went there to interview the appellant. While he was there, Detective Sutherland swabbed the inside of both of the appellant's cheeks to obtain a sample of his DNA. The appellant asked Detective Sutherland to show

[3]At the time of trial, Rayder had retired from the Metropolitan Police Department.

[4]At the time of trial, Detective Anderson was working for the District Attorney General's office.

him photographs of the crime scene and the victim's injuries. The appellant also wanted to know the location of the apartment complex where the rapes occurred. When Detective Sutherland told the appellant that the crimes occurred at the Hickory Ridge Apartments, the appellant said that he was familiar with the apartment complex because his mother had lived there. On July 28, 2008, Detective Sutherland resubmitted the rape kit for testing, and he learned that DNA collected from the victim matched the appellant.

Special Agent Margaret Bash, the forensic quality assurance manager for the Nashville TBI crime laboratory, testified that on August 8, 2000, she was a serologist and DNA analyst. The victim's rape kit was submitted to the crime laboratory with a request to test the victim's blood sample and to examine the vaginal swabs "for sperm or semen and prepare for DNA typing." She said that the internal vaginal swab revealed the presence of spermatozoa. No further testing was done at that time.

On December 27, 2002, after the Combined DNA Index System ("CODIS") came "on line . . . sometime in 2002," the rape kit was submitted to the crime laboratory for "a DNA analysis." Agent Bash performed a "differential extraction so that [she] had non sperm DNA and sperm DNA." Using the victim's DNA "standard," Agent Bash excluded the DNA profile belonging to the victim and established an "unknown male DNA profile," which she entered into CODIS.

Special Agent Bradley Everett, who worked in the serology DNA unit of the TBI crime laboratory, testified that before Agent Bash's promotion, she performed DNA testing on the victim's vaginal swabs and blood and established the DNA profile of the suspect. Thereafter, on July 28, 2008, Detective Sutherland resubmitted the rape kit and asked for testing to be performed on a vial of dirt, the victim's blue jeans and white tank top, and the rectal and oral swabs taken from the victim. Agent Everett said that he did not detect sperm on the oral swabs but that he did detect sperm on the rectal swabs. From the rectal swabs, Agent Everett obtained a partial DNA profile that was consistent with the DNA found on the vaginal swabs. Agent Everett did not find semen in the vial of dirt and explained that sperm may not have been present on the dirt or that microbes or bacteria in the dirt could have destroyed the sperm.

Agent Everett said that he found sperm on the inside crotch area and the inside right knee area of the victim's jeans. On the crotch area, he found a DNA mixture from at least two people. The profile of the minor contributor was too limited for further interpretation, rendering Agent Everett unable to discern even the gender of the minor contributor. The major contributor matched the male DNA from the vaginal swabs. On the knee area, Agent Everett found a mixture of DNA from Laymance and the victim. Upon examining the appellant's DNA, Agent Everett concluded that it matched the DNA found on the vaginal

swabs and the crotch of the victim's pants and was consistent with the partial DNA profile found on the rectal swabs.

The appellant's mother, Geneva Adams, testified for the appellant that prior to 1999, she lived at 601 Margaret Robertson Apartments in Hermitage. Subsequently, she lived in Mt. Juliet. Ms. Adams said that she had never heard of Hickory Ridge Apartments, but she acknowledged that the address was in the area where she lived. On cross-examination, Ms. Adams stated that as a child, the appellant lived with her in the Hermitage area and that he would have been generally familiar with the area. She further stated that the appellant went into military service after he graduated from high school.

The forty-two-year-old appellant testified that he was unemployed at the time of trial but that he had previously been a truck driver and had served in the military. He said that the victim looked like a woman he met at a dance club called Gecko's ten years ago. The appellant said that he and the woman had a conversation at the club and that they "probably" danced together. When the club closed around 2:00 a.m., they left together in a van the appellant had borrowed from his cousin. He said that they drove to Percy Priest Dam, which was located near the club, and that they had consensual vaginal intercourse. The appellant denied that they had anal intercourse and could not explain how his DNA was found on the victim's rectal swab. The appellant said that around 3:00 a.m., he took the woman to "her friend's."

The appellant acknowledged that he had a criminal record consisting of convictions for forgery, theft, and receiving stolen property. He said that he also had a conviction for robbery but that it actually involved his forging checks. He stated that he had no history of violence and that his crimes of dishonesty occurred when he was young. The appellant said that he was innocent of the instant offenses, maintaining that the sex was consensual.

On cross-examination, the appellant clarified that his previous robbery conviction was an aggravated robbery conviction. The appellant conceded that his DNA was found inside the victim and on her pants, but he maintained that he and the victim had consensual sex. Although the appellant never definitively identified the victim as the woman with whom he had sex, he said, "[S]he looks like the lady. . . So if – if you find my DNA, I mean, it must be her." The appellant stated that he met the victim on the night of July 22, 2000, when he was at Gecko's attending a party. The appellant denied wrapping a piece of fabric around the victim's neck and contended that the injuries to the victim's neck and toes must have occurred after he left her with her friend. The appellant also denied that after Detective Sutherland swabbed one of his cheeks, he went into the restroom and washed out his mouth before allowing Detective Sutherland to swab the second cheek.

In rebuttal, Detective Sutherland testified that after he swabbed the inside of one of the appellant's cheeks, he then tried to swab the other side. However, the appellant became "very agitated," refused to give another sample, and went to the restroom. After three or four minutes, the appellant came out of the restroom and agreed to allow Detective Sutherland to swab the inside of the other cheek if Detective Sutherland would answer some questions. Detective Sutherland complied and ultimately told the appellant the location and name of the apartment complex where the rapes occurred. The appellant stated that he was familiar with the location because his mother had lived there.

The jury found the appellant guilty of four counts of aggravated rape, a Class A felony. The trial court imposed a sentence of twenty-five years for each conviction and ran the sentences consecutively for a total effective sentence of one hundred years. On appeal, the appellant challenges the sufficiency of the evidence sustaining his conviction, the trial court's refusal to merge the convictions, and the sentences imposed by the trial court.

## II. Analysis

### A. Sufficiency of the Evidence

On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The appellant was charged with four counts of aggravated rape. In count one, he was charged with penetrating the victim's vagina near the drainpipe by the apartment building while he was armed with a weapon. In count two, he was charged with penetrating the victim's vagina under the stairwell while he was armed with a weapon. In count three, he was charged with penetrating the victim's anus near the drainpipe and causing the victim bodily injury. In count four, he was charged with penetrating the victim's anus under the stairwell and causing the victim bodily injury.

Aggravated rape is defined as the unlawful sexual penetration of a victim by the defendant when "[f]orce or coercion is used to accomplish the act and the defendant is armed with a weapon or any article used or fashioned in a manner to lead the victim reasonably to believe it to be a weapon" or when "[t]he defendant causes bodily injury to the victim." Tenn. Code Ann. § 39-13-502(a)(1) and (2). "'Bodily injury' includes a cut, abrasion, bruise, burn or disfigurement and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty." Tenn. Code Ann. § 39-11-106(a)(2). "'Sexual penetration' means sexual intercourse, . . . anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." Tenn. Code Ann. § 39-13-501(7). This court has previously stated that the term "unlawful" generally refers to non-consensual acts. See State v. Jones, 889 S.W.2d 225, 227 (Tenn. Crim. App. 1994).

At trial, the victim identified the appellant as the assailant who dragged her by a fabric around her neck to a drainpipe area by her apartment building. The appellant continually choked her with the fabric, causing her to lose consciousness and making breathing difficult for her. The fabric, which the victim described as similar to a rope or shoelace, was the weapon alleged in the indictments. See Tenn. Code Ann. § 39-11-106(a)(5)(B) (providing that a "deadly weapon" is "[a]nything that in the manner of its use or intended use is capable of causing death or serious bodily injury"); see also State v. Eaves, 959 S.W.2d 601, 604 (Tenn. Crim. App. 1997) (stating that "[o]bjects other than traditional weapons may, depending on their use, be deadly"). The victim testified that the appellant penetrated her vagina and anus with his penis. Thereafter, he dragged her by the fabric around her neck to an area under the stairwell. He penetrated her vagina and anus with his penis and ultimately ejaculated. The victim said that the fabric "tore off the first layer of skin" on her neck and left a red mark that remained for approximately two years. She also bruised her leg, suffered drag marks on her feet, and still bore scars on her feet. The appellant's DNA was found in both the vaginal and rectal swabs taken from the victim after the rapes. The victim did not consent to the sexual acts.

On appeal, the appellant contends that he had consensual sex around the time of the alleged rape with a woman he met at a club and that the woman looked like the victim. The appellant asserts that "[g]iven the inconsistencies in the testimony and the length of time it took to bring this case to trial, it is clear that the evidence was insufficient to support a verdict of guilty beyond a reasonable doubt." However, the jury, as was its prerogative, discounted the appellant's testimony, weighed the evidence, and chose to accredit the State's proof. See State v. Carruthers, 35 S.W.3d 516, 558 (Tenn. 2000). We conclude that the victim's testimony and the physical evidence amply support the appellant's four convictions of aggravated rape. See State v. McKnight, 900 S.W.2d 36, 48 (Tenn. Crim. App. 1994)

(stating that a victim's testimony alone is sufficient to sustain a rape conviction).

## B. Merger

The appellant argues that because he "was indicted on two alternate theories regarding four counts of aggravated rape," double jeopardy principles dictate that his convictions should have merged into a single judgment of conviction for aggravated rape. In response, the State maintains that the appellant "committed four distinct acts of aggravated rape" and that the trial court did not err. We agree with the State.

The Double Jeopardy Clauses of the United States and Tennessee constitutions protect an accused from (1) a second prosecution following an acquittal; (2) a second prosecution following conviction; and (3) multiple punishments for the same offense. State v. Watkins, 362 S.W.3d 530, 541 (Tenn. 2012). The appellant contends that the present case involves the third category.

The appellant argues that the State charged "alternate theories" of rape. The State disagrees, contending that each count relates to a separate and distinct act. We agree with the State. As we stated earlier, an offender may commit aggravated rape when "[f]orce or coercion is used to accomplish the act and the defendant is armed with a weapon or any article used or fashioned in a manner to lead the victim reasonably to believe it to be a weapon" or when "[t]he defendant causes bodily injury to the victim." Tenn. Code Ann. § 39-13-502(a)(1) and (2).

In the instant case, the State charged the appellant with four distinct offenses based upon the part of the body penetrated and the geographical location where the penetration occurred. Specifically, the State elected that count one concerned the penetration of the victim's vagina near the drainpipe area of her apartment building while being armed with a weapon; count two concerned the penetration of the victim's vagina under the stairwell at her apartment building while being armed with a weapon; count three concerned the penetration of the victim's anus near the drainpipe area of her apartment building and causing the victim bodily injury; and count four concerned the penetration of the victim's anus under the stairwell at her apartment building and causing the victim bodily injury.

Our supreme court has stated that

> "although separate acts of intercourse may be so related as to constitute one criminal offense, generally rape is not a continuous offense, but each act of intercourse constitutes a distinct and separate offense." Moreover, each of the

above-described acts [namely vaginal intercourse and anal intercourse] is separately defined in [Tennessee Code Annotated section] 39-13-501(7) as a discrete type of sexual penetration subsumed by [Tennessee Code Annotated section] 39-13-502, the aggravated rape statute. Each act, in our opinion, is capable of producing its own attendant fear, humiliation, pain, and damage to the victim. Each type of penetration requires a purposeful act on the part of the perpetrator.

State v. Phillips, 924 S.W.2d 662, 664-65 (Tenn. 1996) (footnotes omitted); see also State v. Kendrick, 38 S.W.3d 566, 569 (Tenn. 2001). Based upon the foregoing, we conclude that double jeopardy principles were not violated by the trial court's refusal to merge the convictions. This argument is without merit.

## C. Sentencing

As his final issue, the appellant contends that the trial court erred in determining the length of the sentences and by imposing consecutive sentencing. The appellant disputes that he has an extensive criminal history. Additionally, he asserts the trial court erred by finding that he was a dangerous offender, maintaining that the rapes were basically one continuous episode that occurred over a short period of time and in which the victim suffered no injuries. However, he failed to support his sentencing arguments with any citation to authority. Additionally, the appellant failed to argue exactly how the trial court erred in determining the length of each sentence, and his only argument concerning consecutive sentencing is that his "aggregate sentence of one-hundred years . . . is not reasonably related to the severity of the crimes." Given the appellant's failure to comply with our court rules and the rules of appellate procedure, we conclude that he has waived this issue. See Tenn. Ct. Crim. App. R. 10(b);Tenn. R. App. P. 27(a)(7).

## III. Conclusion

In sum, we conclude that the evidence was sufficient to sustain the appellant's convictions, that double jeopardy principles did not require merger of the convictions, and that we discern no error made by the trial court in sentencing the appellant. Therefore, we affirm the judgments of the trial court.

_____
NORMA McGEE OGLE, JUDGE

-10-